[No. 1879.]

$\begin{array}{cc} 17 & 321 \\ 37 & 434 \end{array}$

## Tom McMahon v. The State.

1. Jury Law — Practice — Waiver.— Irregularities in the organization of a trial jury should not be tolerated, but, if permitted by the trial court, the error, to be revised by this court, must be promptly excepted to at the very time, and not for the first time on motion for new trial. If not objected to at the proper time, and a jury is selected without objection, the defendant will not be heard to complain afterwards, but will be held to have waived all such objections.

2. Same.— New Trial can be awarded only upon some one or more of the grounds enumerated in article 777 of the Code of Criminal Procedure. Illegal organization of the trial jury is not one of the grounds enumerated in the said article.

3. Same — Arrest of Judgment.— An acceptance of the jury by the defendant is a waiver of the right to question its organization on motion for new trial, or in arrest of judgment.

4. Same — Arson — Fact Case.— Where the evidence is insufficient to support a conviction, a new trial should be awarded. See the statement of the case for evidence held insufficient to support a conviction for arson.

Appeal from the District Court of Hill. Tried below before the Hon. Jo Abbott.

The appellant was convicted of arson under an indictment charging that he did, in Hill county, Texas, on the 1st day of July, 1884, burn a certain house known as the "Ewell House." His punishment was assessed at confinement in the penitentiary for the term of five years.

E. B. Stroud was the first witness for the State. He testified that the Ewell Hotel fire, in the town of Hillsboro, Hill county, Texas, occurred on the 29th day of July, 1884. Witness was at that time mayor of the town of Hillsboro, and, as such mayor, he organized a jury of inquest to investigate the facts attending the fire, and, if possible, ascertain its origin. Between the hours of 8 and 9 on the morning of the fire, the witness, with the jury of inquest, repaired to the scene of the fire. It had then been extinguished. It was discovered that the fire originated in a closet between the office of the Ewell Hotel and the saloon of the defendant, which was located under a stairway leading from Waco street to the upper story of the hotel. The closet in which the fire originated opened through one door into the hotel office, and through another door into the defendant's saloon. It could be entered through either of these doors. The fire appeared to have commenced burning in the western portion of the said closet, between

the two doors. It climbed the wall to the ceiling at the head of the stairway. The door connecting the hotel office and the closet was considerably burned and charred. The fire was extinguished about daylight. Witness did not go to the fire at the first alarm, nor before he went with the jury of inquest.

Two full and four or five partially filled barrels of water and several empty barrels were found in the defendant's saloon. Of the twelve or fifteen barrels found in the saloon, one was full of whisky and another about a quarter full. Some half barrels and kegs held quantities of brandy, wine, etc., but the witness could not say how much. The estimate on the stock, bar fixtures, etc., made by the jury in their inventory was placed at $250. Witness did not know that any of the barrels of liquors were measured or gauged. Witness could not estimate the value of the defendant's bar mirror, glasses, bottles, glassware and counter. Several parties were in the saloon when the defendant and the jury arrived. The barrels of water and whisky stood in the same room.

J. E. Ballard was the next witness for the State. He testified that he was one of the jury of inquest summoned to inquire into the origin of the Ewell Hotel fire. He described the location of the closet between the hotel office and the defendant's saloon, connecting the two, as it was described by the witness Stroud. He did not, however, go into or examine that closet after the fire. Several parties were in the saloon when the jury of inquest arrived. Witness was a saloon keeper, was familiar with the character of goods necessary to conduct the business of saloon keeping, and knew what was considered a fair stock in running a respectable saloon. The defendant's stock was estimated by the jury to value about $160. One barrel full, and another containing a small quantity of whisky were found in the defendant's saloon. Several kegs containing brandy and wines were also found. These liquors were not gauged, but their value was estimated by inspection of the barrels and kegs. There were also two or three barrels containing water in the saloon of the defendant. The witness and the jury arrived on the scene some three or four hours after the fire. The defendant was present when the stock in the saloon was being inspected. Nothing less than an eight or ten hundred dollar stock would be considered a respectable stock for a small saloon business. The jury of inquest inventoried the Ewell Hotel stock and estimated it to value between seven and eight hundred dollars. Witness was not personally familiar with the value of hotel equipment.

Tom Bell was the next witness for the State. He testified that

the fire alarm was sounded about daylight, when he got out of bed and went to the Ewell Hotel. The fire had been extinguished when he reached there. He looked into the closet (which he described as did the previous and all the subsequent witnesses who described it at all), but did not see an oil can. The fire appeared to have caught between the two doors, and in the western part of the closet, and had burned mostly on the side next to the hotel office. The closet floor was not burned. The fire seemed to have caught on the wall next to the hotel office, and climbed thence to the ceiling at the head of the stairway leading from Waco street to the second story of the hotel building. Witness went through the defendant's saloon and saw some twenty or more persons in there who had arrived before he did. He made no particular examination of the goods and fixtures in the saloon. Witness did not remember seeing the defendant at the saloon until he (witness?) was returning to town from breakfast. Witness remained at the place of the fire but a few minutes. He saw no guns in the closet.

Major Ewell testified, for the State, that he was the proprietor of the Ewell Hotel at the time of the fire. He was not at that time living in the hotel, but with his family was occupying a house rented from Judge Abbott. Witness got to the place of the fire between daylight and sunrise, and found the streets about the hotel full of people. The saloon had been broken open and was full of people. The fire originated in the closet between the hotel office and the defendant's saloon. The defendant had a key to the closet door which opened into his saloon. This key defendant sometimes kept, and sometimes left in the closet door lock. A bolt was also attached to this door. The closet door on the hotel side was considerably burned and charred; that on the saloon side, but little, if at all. On entering the closet the witness discovered a can of Eupion oil. This can was stopped by means of a top screwed down over the mouth or opening. It was quite warm when it was taken out by Nick Farrar. The witness used only the "Brilliant" oil, and had never used the Eupion oil. The oil used about the hotel was always furnished upon the witness's order, and he had never ordered the Eupion oil. Witness would not swear positively that no one else about his hotel ever ordered oil, but felt quite sure that all the oil ever used was furnished upon his order. The closet door on the hotel side was secured by an ordinary lock, the key to which ordinarily hung on a nail in the office. Sometimes that closet door was left unlocked. Witness had several servants and employés about the hotel. At the time of the fire, Clayton Ewell, witness's son,

James Muse and a negro cook were in his employ, but the cook slept away from the hotel. Muse had charge of the hotel at night, and had the imperative orders of the witness to keep the doors, windows, etc., securely locked at night. While witness could not swear that Muse always followed out this order, he could say that he had never found the doors and windows of his hotel unlocked after night. Muse had control of the hotel keys, and attended to the opening and closing of the house.

There was a door to the hotel office in front, a window on the side and a door leading from the office to the dining room. There was a door leading from the dining room to the kitchen. There were three windows on the side of the dining room and kitchen, and two others in the rear of the building. One flight of stairs led from the front of the hotel to the second story. Another flight connected the second story with the dining room below, and a third flight mounted to the second story from the rear of the hotel. Three or four guns, two or three of them belonging to witness, and one to his son, stood behind the door in the closet where the fire occurred. These guns were recovered uninjured. The closet, when the two doors described were left open, formed a passage between the hotel office and the saloon, and it was intended for use only on Sundays, to give access to the saloon from the office, and those two doors were left open only on Sundays when the passage was free to the public. It was not used for such purpose on other days, except occasionally by the witness himself. Breakfast was served at the Ewell Hotel from 6:30 to 8 o'clock. The fire was about extinguished when the witness reached the hotel.

The witness had in his hotel, at the time of the fire, about one thousand or twelve hundred dollars' worth of furniture and other hotel equipments. A short time before this fire the witness took out, through A. L. Lowery, agent, an insurance policy, for $750. A few weeks before this fire, a mattress that was stretched on plank resting on two wooden horses in an upper room of the hotel caught fire. It communicated fire to an adjacent box of old papers, before it was discovered and extinguished. This first fire was supposed to have been originated from cigarettes smoked by small boys, who, to escape detection while smoking, resorted to that room and concealed themselves under the shelter afforded by the mattress. Witness did not know this to be a fact, but had been informed that boys resorted to that room to smoke cigarettes. After the fire in the mattress the witness returned his policies of insurance to Lowery, who canceled them. Witness's reason for having these policies canceled was that

he did not feel himself able to carry the expense of insurance. Since this last fire the witness had sold out and retired from the hotel business.

James Muse, clerk at the Ewell Hotel, testified that he was in bed in his room in the rear of the building when the fire was discovered. He was awakened by smoke pouring into his room. He could not at first locate the fire, but saw and smelled the smoke. He first went down stairs and into the back yard; then back to his room, where he secured his trunk and returned to the yard. Thence he went around in front and found several people collected. The front door of the hotel had been forced, and the hotel door to the closet, in which the fire was discovered, had been wrenched from the hinges. Witness saw a can of oil in the closet, standing between the two doors. Both the closet doors were then open. The defendant had a key to the door between the closet and the saloon. The key to the door between the hotel office and the closet was usually kept on a small shelf in the office near the closet door. The closet at the time of the fire contained considerable plunder and several guns, which guns were removed by some one. The inside of the closet was lathed but not plastered. During the time of the fire the witness saw the defendant rush into his saloon, seize his United States revenue and State liquor occupation license, and what witness took to be his account book, and leave the saloon with them. It was the business of the witness to lock the doors, and fasten the windows, of the hotel at night. He could not say that the windows were securely fastened down at all times. Witness described the construction of the house exactly as did the witness Ewell.

N. S. Buck testified, for the State, that he was in the employ of the defendant as bar-keeper at the time of the fire. He had one key to the front door of the saloon, and the defendant had another key to the same door. The rear door of the saloon was fastened by a bolt on the inside, the means of egress always being by the front door. There were two windows to the saloon. The fire alarm was sounded at about 5 o'clock in the morning, or about good daylight. The witness was so excited when he reached the saloon that he went first to the bolted door, which he could not open. Thence he went to the front door, but in his excitement failed to unlock it. By this time, some of the large number of persons who had congregated broke in the rear door of the saloon, and the crowd rushed in. The closet door on the saloon side was found locked and bolted. When, on the previous evening, before dark, the witness filled the lamps with oil kept in the saloon by the defendant, he placed the

can from which he got the oil near the window in the rear of the saloon. On getting into the saloon, the witness looked for the can where he had placed it, but it had been removed by some one. Witness saw the oil can that was found in the closet, but, as there are so many just like it, he could not identify it as the defendant's can which was kept in the saloon. The defendant left the saloon for home, on the night preceding the fire, between 8 and 9 o'clock. He was then quite drunk. Witness did not see the defendant again that night, but saw him at the fire next morning when he, defendant, rushed into the saloon and secured his revenue and State license and account book. Witness closed the saloon about 10 o'clock on the night previous to the fire. It was his custom to open the saloon about daylight; defendant's trade was quite a good one.

Nick Farrar testified, for the State, that he found several persons present when he reached the scene of the fire. Both the saloon and the two closet doors were open when witness arrived. Witness saw a can of oil in the closet when he arrived, and he removed it. It was hot, but was stopped in the manner described by the witness Ewell. This can seemed to have been slided along the floor from the hotel door of the closet. This was the impression of the witness from the fact that the ashes had fallen on each side of the place. The can was about half or two-thirds full of oil. The fire caught the wall near and above the floor, where the oil can sat. The closet floor was not burned. This oil can was shown to and examined by the defendant. He said that the can must be his, but he had no idea how it came to be placed in the closet. Witness saw no guns in the closet. He estimated the number of people in the saloon when he got there at twelve. Every person present had free access to everything in the saloon, but no one took anything that the witness saw. Some of the parties were smoking, and Mr. Buck or some one else handed the witness a cigar in the saloon.

A. L. Lowery testified, for the State, that, as agent of the St. Paul Fire and Marine Insurance Company, he insured the defendant's stock for six hundred, his fixtures for two hundred and fifty, and his partition wall for one hundred and fifty dollars. This insurance, making in all $1,000, was written in March, 1884. At the time the policy was written the defendant showed the witness his barrels, cigars, fixtures, etc., and said that he had a good stock of liquors, and he, witness, thought that, at the time of the insurance, the defendant had a stock worth the amount of his policy. The barrels were then full of something. The insurance policy contained a clause to the effect that the company was responsible, in

case of loss or damage, only for three-fourths of the actual cash value of the goods in stock at the time of such loss or damage by fire; and that such loss was not payable until sixty days after proof of loss at the general office of the company located at Houston. Witness, with money furnished him by the company, employed A. P. McKinnon as special counsel to prosecute the defendant. The defendant has never made claim for loss or damage. On the day of, and after the fire, the defendant's policy was canceled by agreement, and the witness paid the defendant his rebate. The defendant had not at the time of the fire paid the premium in full, and the policy was canceled so that the defendant could get his return premium. About a month prior to the fire the defendant showed the witness what purported to be his stock, and said that he had a good stock of whiskies. On the morning of the fire, while the crowd was around and about the saloon, the defendant said that some of the crowd had poured about a thousand dollars' worth of whisky on the floor. The floors gave no indication of whisky or other burned liquid.

Doctor H. W. Dudley testified, for the State, that he loaned the defendant $500 to assist him in opening his saloon, and took a mortgage on the goods, fixtures, etc., to secure the loan. He did not record his mortgage, because he was afraid such a record would embarrass defendant in getting out insurance. At different times defendant had made payments to the witness, leaving due at the time of the fire about $100 of the principal, and all of the interest on the loan. Witness generally got money from the defendant when he called for it, failing but once. Defendant on that occasion did not, he said, have the amount demanded, but promised and did pay it within the week. Defendant also owed the witness a medical bill of $150, making his entire indebtedness to witness about $300. After the fire, on the morning that it occurred, defendant made to the witness a bill of sale, conveying his entire stock in the saloon except some lumber. He told witness that the stock would realize more than witness's claim, but to sell the same and pay him the overplus. Witness found in stock one full barrel of whisky, another about one-third full, and a twenty gallon keg nearly full. All of the whisky bottles were full. He found also some cigars, and some kegs containing brandy and wines. George Sweeney claimed the full barrel of whisky, but did not contest his claim. Witness sold the whole stock for $250 in cash and credit payments, realizing less than his demand against the defendant.

J. W. Williams testified, for the State, that the witness N. S.

Buck slept with and stayed with him during the whole of the night preceding the fire, and that witness and Buck went to the fire together when the alarm was sounded.

Frank Harris testified, for the State, that he clerked for Hawkins & Wellborn, hardware merchants. Similar locks to those on the door of the defendant's saloon usually had two keys. It was sometimes the case that other keys would fit different locks. Witness knew of four different keys, not belonging to it, that would fit a lock on Hawkins & Wellborn's hardware house. He had never tried any other locks. At this point the State closed.

A. J. Jasper was the first witness for the defense. His account of the fire did not vary materially from that given by the witnesses for the prosecution. It was this witness who broke in the hotel door, and the door to the closet. It was he who threw water on the fire and extinguished it. He saw the oil can in the closet, but noticed no other articles. If he saw the defendant during the fire, the witness did not mention it in his testimony.

W. B. Johnson was the next witness for the defense. He testified that he had seen other parties than Major Ewell pass through the closet between the hotel and the saloon on other days than Sunday. He particularly remembered that on the day of the firemen's picnic he and other parties passed through that closet.

Adam Booth testified, for the defense, that he always did the scouring of the saloon for the defendant, and always did it on Sunday. During the heavy spring rains, the witness, as directed by the defendant, placed a barrel under the drip to catch rain water to be used for scouring purposes. He caught that barrel full. Witness took another barrel of rain water to the defendant's saloon from a distant point where he caught the water.

Josh Billings testified, for the defense, that some travelers *en route* to Whitney stopped with him during the night before the fire. As they asked for an early start, witness got up next morning very early and started to the butcher shop for breakfast meat. When he got to the corner near Harrington's business place he heard the alarm of fire and saw smoke issuing from the Ewell House. He went at once to the Ewell House. A man up-stairs was crying loudly for a ladder. Witness and Pat Hood went for a ladder, and when they returned they found the hook and ladder fire company on the ground. Witness saw Clayton Ewell in the hotel office. Some one kicked the closet door from its hinges. That door was burning. The fire, which was confined to the closet, was then extinguished by the use of water. The burning in the closet seemed

to be confined to the hotel side.    Witness saw no guns in the closet, nor did he see any one remove any guns from the closet.

Bud Isbell testified, for the defense, that he was frequently about the defendant's saloon, and had often helped the defendant about his saloon, sometimes closing for him at night.    As often as the defendant left the saloon in the charge of the witness at night, he always cautioned the witness to lock it securely and extinguish all the lights.    The defendant, as far as witness could see, did a good business.    Witness was never regularly in the service of the defendant, but served him on the occasions spoken of as a mere matter of favor.    The witness knew that the defendant kept rain water in at least one barrel, which he used for washing purposes.    The barrel he spoke of had a faucet in one end.

P. S. Hood testified, for the defense, that on his way to the fire, after he heard the alarm, he encountered Josh Billings and the two went together to the Ewell House.    They bursted through the back room of either the saloon or the dining room, and heard some one in the upper story calling for a ladder.    They went after a ladder and on their return found the firemen on the ground.    They entered the hotel just as several parties were breaking into the closet.    Witness could then smell the burning of coal oil, and afterwards saw a coal oil can taken out of the closet.    It was hot from fire heat.    Witness saw no guns in, or taken from, the closet.

Tax Collector Warnell testified that on March 2, 1884, he issued to the defendant a State and county license to pursue the occupation of a saloonist until March 2, 1885, and received therefor the regular tax, $450.    His recollection was that the defendant then had his United States internal revenue tax receipt, which, on tobacco and cigars, was $5, and on liquors $25.

Judge W. A. Harrison testified, for the defense, that he purchased from Dr. H. W. Dudley the stock of liquors and fixtures that originally belonged to the defendant.    He was careful to see if any of the empty barrels or cigar boxes had uncanceled stamps on them.    He found two barrels of water in the saloon.    One of these the witness used in scouring the saloon, and the other he sent home for washing purposes.    This was two or three weeks after the fire.    Witness did not know whether or not, prior to that time and since the fire, any barrels of water had been removed from the saloon.    The stamps on the barrels containing water were plainly canceled.

Mrs. McMahon, the wife of the defendant, testified in his behalf that the defendant came home on the night before the fire between 8 and 9 o'clock, considerably under the influence of whisky.    He

retired very soon after getting home, sleeping in the same room and the same bed with the witness. He slept and staid in that bed throughout the entire night. He did not get out of bed a single time. He could not have done so and the witness not known it. The witness was awakened about daylight on the next morning by the fire alarm. She instantly called the defendant, but failed to arouse him. She continued to call him in a loud voice, and shook him severely, succeeding after some time and trouble in getting him awake. She then told him that there was a fire in town. Defendant got up instantly and dressed rapidly. Mrs. Newman, a neighbor, called out to the defendant that the fire seemed to be at the Ewell House, and the defendant went out the back way towards town.

C. B. Trippett testified that he and the defendant lived in houses situated about fifty steps apart. About daylight on the morning of the fire, the witness was awakened by the wife of the defendant calling to the defendant to wake up. He several times distinctly heard Mrs. McMahon call the defendant to wake up, and as often heard her tell him that there was a fire in town. The alarm had been given from town. This was in the summer, and the witness slept with all his windows up. Witness put his head out of a window, saw the defendant standing in his door, and asked him where the fire was. Defendant answered that it was somewhere in town. Witness got up, dressed, went to town, and reached the hotel about the time the fire was extinguished.

The motion for new trial presented the questions discussed in the opinion.

*J. M. Johnson* filed an able brief for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. Objection to the mode and manner of preparing the jury list by the clerk was made for the first time in defendant's motion for a new trial. It is shown by a bill of exceptions granted by the trial judge that the requirements of the statute (Code Crim. Proc., arts. 645 and 646) had not been complied with, in that the clerk did not draw the names from the box and enter them upon two slips of paper, but that he had, prior to the announcement of ready for trial, already prepared his lists for the parties; and the court, in an explanation to the bill, states that this practice has been adopted in order to expedite business.

Such practice is an innovation upon the statute, and many good

reasons suggest themselves in behalf of a strict observance of the statutory method. Suffice it to say, however, that objections to the mode and manner of drawing and preparing the jury list should be made at the time. If not done then, and a jury is selected from the lists prepared, without objection, the defendant will not be heard to complain afterwards, but will be held to have waived all such objections,— since he can waive every right except the right of trial by jury. Moreover, such an objection cannot be urged nor entertained on the motion for new trial,— it not being one of the grounds for new trial enumerated in the statute, and none other than those enumerated will be allowed. (Code Crim. Proc., art. 777.) An acceptance of the jury by the accused is a waiver of the right to question its organization on motion for new trial or in arrest of judgment. (*Buie* v. *The State*, 1 Texas Ct. App., 452.)

Several other exceptions to the admission of testimony and the charge of the court are shown by the record. They are in the main so meagre as scarcely to apprise us fully and certainly of the facts necessary to be understood so as to enable us to pass intelligibly upon the objections. Without discussing them in detail, we are of opinion that none of them, if we properly understand them, are maintainable as legal objections.

In our opinion, however, the objection to the sufficiency of the evidence to uphold and sustain the verdict and judgment is well taken. We have given the evidence, as set forth in the statement of facts, a most careful and mature consideration, and, in our opinion, it fails to show a stronger, if, indeed, it shows as strong, a case against this appellant as other parties whose opportunities for committing the crime charged, if any crime has been shown, were equally as favorable as his, and perhaps with as strong inducements as are shown on his part. We do not wish to be understood as intimating that the evidence goes to establish the guilt of any one, for we do not think it does. It certainly does not establish appellant's guilt with that degree of moral certainty as would exclude every reasonable hypothesis of his innocence, and, though he may be guilty, we do not believe it would be safe to let this conviction as disclosed in the record before us stand as a precedent.

Because the evidence is insufficient, and because the court below should have granted a new trial, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

[Opinion delivered December 10, 1884.]